Elizabeth Diane DOWNS,
Petitioner–Appellant,

v.

Sonia HOYT, Respondent–Appellee.

No. 99–35266.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 13, 2000

Filed Nov. 15, 2000

---

Wendy R. Willis, Assistant Federal Public Defender, Portland, Oregon, for the petitioner-appellant.

Janet A. Klapstein, Assistant Attorney General, Salem, Oregon, for the respondent-appellee.

Before: KOZINSKI and KLEINFELD, Circuit Judges, and SCHWARZER,* Senior District Judge.

SCHWARZER, Senior District Judge:

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Elizabeth Diane Downs was convicted of murder, attempted murder,

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

and assault in the Lane County Circuit Court in Oregon in 1984. The jury found that she fatally shot one of her children, Cheryl, then age seven, and seriously wounded the other two, Christie and Danny, then ages eight and three. Christie testified at trial that she saw her mother open the trunk of her car and then shoot each of the three children. Ballistics experts testified that bullets taken from Downs's home had extractor marks identical to cartridge casings found at the crime scene. The marks were from a .22 caliber Ruger semiautomatic pistol, the same make of a firearm which Downs had possessed and used previously. Downs's gun was last seen in her possession in 1983. The murder weapon was never recovered.

Downs's conviction was affirmed on appeal by the Oregon Court of Appeals without opinion and the Oregon Supreme Court denied review in 1987. *See State v. Downs*, 83 Or.App. 698, 733 P.2d 119 (1987), *rev. denied*, 303 Or. 370, 738 P.2d 199 (1987). Downs then sought postconviction relief in state court. The postconviction court granted summary judgment on the prosecutorial misconduct claims and held a trial on Downs's other claims, hearing testimony from the trial participants and others. It granted relief on two claims related to restitution and sentencing and denied Downs's remaining claims. The Oregon Court of Appeals affirmed without opinion in 1993 and the Oregon Supreme Court denied review. *See Downs v. Schiedler*, 124 Or.App. 211, 861 P.2d 1046 (1993), *rev. denied*, 318 Or. 582, 873 P.2d 321 (1994).

Downs first sought habeas relief in the Eastern District of California in November 1993. That petition was dismissed without prejudice for failure to exhaust state remedies. She filed the instant petition in the district court in Oregon on June 25, 1996, and filed an amended petition containing nine claims on January 17, 1997. After permitting Downs to conduct discovery and expand the record, the district court denied the petition without a hearing on February 8, 1999. This appeal followed and we now affirm.

## SCOPE OF REVIEW

█ We review the district court's denial of the petition *de novo*. *Houston v. Roe*, 177 F.3d 901, 905 (9th Cir.1999), *cert. denied*, ——— U.S. ———, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000). We review the court's factual findings for clear error, *Houston*, 177 F.3d at 905, and we presume the state court's factual determinations to be correct. 28 U.S.C. § 2254(e)(1). Because the petition was filed on June 25, 1996, following the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), the provisions of that Act control. *See Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

█ Downs, citing *Delgado v. Lewis*, 181 F.3d 1087 (9th Cir.1999), argues that the state court decisions are entitled to little deference because the Oregon appellate courts issued no opinions and because some of her postconviction claims were disposed of by summary judgment. *Delgado* rests on the rationale that the state court, which had no briefs from petitioner, had not articulated its reasons for denying relief. *Id.* at 1091 n. 3. Here, in contrast, the postconviction court stated its reasons in a three-page letter opinion followed by fourteen pages of findings on which judgment was entered, and the appellate courts had before them briefs fully presenting the merits. We are satisfied that Downs's claims were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d).

The district court's decision was rendered before the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and our decision in *Van Tran v. Lindsey*, 212 F.3d 1143 (9th Cir.2000). *Williams* construed § 2254(d)(1) to provide that the writ may issue when the federal court is firmly convinced that the state court was "simply wrong" and that a federal constitutional right has been violated, even if the state court's decision appears "at first-blush" to

be "entirely reasonable." *Id.* at 1511. *Williams*'s "objectively unreasonable" standard is further explicated in *Van Tran* where we said:

> [U]nder AEDPA we must reverse a state court's decision as involving an "unreasonable application" of clearly established federal law when our independent review of the legal question ... leaves us with a "firm conviction" that one answer, the one rejected by the court, was correct and the other, the application of the federal law that the court adopted, was erroneous-in other words that clear error occurred.

212 F.3d at 1153–54.

█ We may affirm on any ground supported by the record, even if it differs from the district court's rationale. *See United States v. Washington,* 969 F.2d 752, 755 (9th Cir.1992), *cert. denied,* 507 U.S. 1051, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993). Because the district court applied the wrong standard, we must decide whether its judgment can be affirmed under the correct standard.

## DISCUSSION

Downs raises nine claims: (1) that the state's failure to disclose certain handwritten investigatory notes violated its obligations under *Brady;* (2) that the destruction of some of these notes was in bad faith and violated due process; (3) that prosecutor committed misconduct by reading excluded portions of Danny's medical records during the state's closing argument and that trial counsel's failure to move for a mistrial denied Downs effective assistance of counsel; (4) that the prosecutor's improper questioning of Downs on cross-examination constituted prosecutorial misconduct, and that trial counsel's failure to object, move for a mistrial, or call the diagnosing psychiatrist denied Downs effective assistance of counsel; (5) that Christie's testimony was tainted as the result of improper influence and that trial counsel's failure to object denied Downs effective assistance of counsel; (6) that trial counsel's failure to introduce a state police fingerprint report at trial denied Downs effective assistance of counsel; (7) that trial counsel's failure to call Dr. Jerome Vergamini, a hospital staff psychiatrist who interviewed both Christie and Danny, denied Downs effective assistance of counsel; (8) that the trial court gave an impermissible *Allen* charge to the jury which violated Downs's Sixth Amendment right to a fair trial and that appellate counsel's failure to raise this issue on appeal constituted ineffective assistance; and (9) that the trial court's denial of a continuance for new counsel violated Downs's Sixth Amendment right to counsel and that appellate counsel's failure to raise this issue on appeal constituted ineffective assistance.

## I. FAILURE TO PROVIDE MATERIAL, EXCULPATORY EVIDENCE

█ Downs first contends that the state deprived her of evidence helpful to her defense. While the state provided her with four reports, Downs did not receive information on some 100 leads contained in the sheriff's file, including pictures and names of suspects, license plate numbers of vehicles matching the description given by Downs, and names and phone numbers of citizens and law enforcement officials with potentially relevant information. Downs argues that these matters were material because (1) additional witnesses would have supported her version of the events and provided her with an opportunity to track down the shooter, and (2) they would have shown that Lane County authorities focused almost immediately on her rather than conducting a proper investigation. She points specifically to a note memorializing a call from a person who overheard a conversation in which a man stated he thought he knew the killer but was afraid to contact authorities because the killer was affiliated with the Free Souls, a motorcycle gang. The notes also contained a record of an early interview with Christie in which she said that she did not know someone had injured her.

■ The prosecution's suppression of evidence favorable to the accused violates due process when the evidence is material to guilt or to punishment. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678, 105 S.Ct. 3375.

The state court granted the state's summary judgment motion on this claim. The district court, after permitting Downs to take discovery and conducting an independent review of the record, denied the claim, finding that Downs's argument amounts to speculation that the withheld material *might* have led to some admissible evidence which *might* have been sufficiently favorable to meet the *Bagley* standard.

■ The district court's characterization of Downs's claim is correct. The most that can be said of these materials is that they might have provided investigatory leads. *Brady* does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up. *See United States v. Agurs,* 427 U.S. 97, 109, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Coleman v. Calderon,* 150 F.3d 1105, 1116–17 (9th Cir.1998) (failure to disclose evidence of other suspects not material because there was no direct or circumstantial evidence linking the third persons to the crime), *judgment rev'd on other grounds,* 525 U.S. 141, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998), *cert. denied,* 525 U.S. 1058, 119 S.Ct. 625, 142 L.Ed.2d 563 (1998). Downs's arguments, moreover, are speculative and fail to point out, as required by *Bagley,* how production of these materials would have created a reasonable probabili-

ty of a different result. 473 U.S. at 682, 105 S.Ct. 3375. As for the notes of the early interview of Christie in which, due to her aphasia, she was able to respond only by opening or closing her eyes, they indicate only that at that time Christie did not know that she had been hurt. They said nothing about how she might have been hurt, and Christie's initial lack of memory was brought out at trial. As the notes do not cast doubt on the verdict, the state court's rejection of this claim was not clearly erroneous.

## II. DESTRUCTION OF DEPUTY POND'S HANDWRITTEN NOTES

■ Downs contends that her due process rights were violated by Deputy Pond's destruction of his handwritten notes. The district court held that the prosecutorial misconduct claim was defaulted because it was never raised in the state proceedings. The claim was raised, however, in the post-conviction court and disposed of on summary judgment. Because the claim was fairly presented to the state court and nothing indicates that it was rejected on an independent state ground, it is properly before us. *See Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

■ Unless Downs can show bad faith on the part of the prosecution, failure to preserve potentially useful evidence does not constitute a denial of due process. *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Downs's argument that bad faith may be inferred from the facts that the trial court was uncomfortable with Pond's veracity and demeanor; that Pond's testimony about the number of reports and handwritten notes was contradicted by the large number later found after the district court's discovery order; and that the destruction appeared to have been selective, i.e., that the only handwritten notes missing from Pond's file are those relating to suspects other than Downs, is not persuasive. The trial court stated that Pond was

just as likely confused as evasive in his testimony. In addition, Pond did retain reports on certain people who eventually became defense witnesses and he appears to have incorporated many of his notes into various reports, some of which Downs received. Moreover Downs has failed to show that these materials had potential exculpatory value as required by *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The state court's rejection of this claim was not clearly erroneous.

## III. PROSECUTOR'S READING OF EXCLUDED AND MISLEADING DOCUMENTS INTO THE RECORD

As her third claim, Downs contends that the prosecutor acted improperly during closing argument when he read a statement by Danny Downs identifying his mother as the shooter. The state had earlier moved successfully to exclude portions of the medical reports in which that statement appeared.

### A. Due Process

 While the government may not "suggest that information not in evidence supports its case," *United States v. Badger*, 983 F.2d 1443, 1455 (7th Cir.1993), *cert. denied*, 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993), prosecutorial misconduct violates due process only if evidence is presented which "taken as a whole" gives a jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957) (per curiam). It is uncontested that the prosecutor, confused about which portions of the voluminous medical records had been admitted into evidence, read Danny's statement inadvertently. Furthermore, the reference was made in passing in the course of an eight-hour closing argument and the prosecutor, immediately after reading the statement, explicitly told the jury that he did not believe it to be competent evidence of Downs's guilt. Upon defense counsel's objection, the prosecutor apologized and immediately changed the topic. The state

court granted summary judgment on the claim and the district court rejected it. We find no clear error.

### B. Ineffective Assistance of Counsel

 Downs further contends that trial counsel should have moved for a mistrial after the prosecutor's statement. The state court found that trial counsel, after conferring with Downs, made a valid tactical judgment not to seek a mistrial and that the prosecutor's action was not in fact ground for a mistrial. To establish ineffective assistance of counsel, a defendant must show both that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The second, or prejudice prong, requires a showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. The question is not whether the verdict would more likely than not have been different, but whether the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *See Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

 There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or "sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Tactical decisions after consultation with the client are "virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052. Moreover, even if Downs could show deficient performance, the record does not establish a reasonable probability that, but for counsel's alleged ineffective performance, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. As Downs cannot show that she did not receive a fair trial, understood as a trial resulting in a verdict worthy of confidence,

the state court's rejection of this claim was not clearly erroneous.

## IV. PROSECUTOR'S REFERENCE TO DEVIANT SOCIOPATH DIAGNOSIS DURING CROSS-EXAMINATION

Downs also claims that the prosecution's cross-examination deprived her of due process and that trial counsel's failure to object and move for a mistrial denied her the effective assistance of counsel.

### A. Due Process

■■■ Prosecutorial misconduct, as noted above, violates due process only if a prosecutor presents evidence which "taken as a whole" gives a jury a "false impression." *Alcorta,* 355 U.S. at 31, 78 S.Ct. 103. On cross-examination, the prosecutor asked Downs, "You were labeled a deviant sociopath by the tests [Dr. Jamison] gave you?" She answered, "I don't know.... She didn't discuss names. She discussed different qualities that I carried at that time." Defense counsel did not object and made no motions. Prior to trial, Downs had consulted a psychologist, Dr. Polly Jamison, who twice administered the Minnesota Multiphasic Personality Inventory test to Downs. The cover sheets on both reports list "deviant" and "sociopathic" as relevant classifications. Downs contends that the question was misleading and that the prosecutor was obligated to correct any misperception.

The state argues that this claim was raised in the postconviction court only as an ineffective assistance claim and the district court held it procedurally defaulted. Even if the claim were properly before us, it cannot be said that this question, coming during a four-day cross-examination of Downs and dealing with her psychological state-a relevant matter-so infected the trial with unfairness that it denied her due process. The state court's finding that there was nothing improper about the question and that it was not ground for a mistrial was not clearly erroneous.

### B. Ineffective Assistance of Counsel

■■■■ Downs further contends that trial counsel's failure to object, move for a mistrial, or call Dr. Jamison was ineffective assistance. Counsel's decision not to seek a mistrial in the fourth week of what turned out to be a six-week trial was a tactical judgment, as was counsel's decision not to call Dr. Jamison to rebut the question's implication. Neither can it be said to have constituted deficient performance. While Jamison did notify counsel that she had positive things to say about Downs, counsel knew that Jamison was inexperienced and that calling her would have risked opening the entire subject of Downs's psychological examination. Moreover, Downs has not shown prejudice, particularly as the prosecutor promptly dropped the line of inquiry and changed the topic. Accordingly, the state court's rejection of Downs's claim was not clearly erroneous.

## V. USE OF CHRISTIE'S TESTIMONY

Downs also contends that the state's lengthy effort to revive the memory of Christie, the only eyewitness, involved suggestive questioning and improper influence which resulted in tainted testimony and denied her a fair trial. Downs also argues that trial counsel's failure to challenge the competency of Christie's testimony denied her effective assistance.

### A. Due Process

■■■ Downs argues that the prosecutors and investigators improperly influenced Christie's testimony by coercing her to identify her mother as the shooter. The facts on which Downs relies to establish that Christie's memory was tainted are: the sheer number of interviews (at least eighty before Christie's trial testimony, a number the state vigorously disputes); their allegedly coercive nature; the predominance of suggestive, closed-ended questions that had to be answered yes or no; and her extended state custody surrounded by persons under state control.

(Downs was denied access to her daughter both before and after the trial.)

The district court held that this claim was not defaulted. We agree, albeit for a different reason, having found that Downs's briefs in the Oregon Court of Appeals and the Oregon Supreme Court make specific reference to "the larger issue of the coercion and manipulation of a traumatized 8 year old."

In response to Downs's sweeping generalizations, the state in its brief presents a chronology of the treatment of and communications with Christie, detailing the care with which state agents dealt with Christie and debunking Downs's claims regarding the coercive nature of the interviews. We note particularly Christie's first substantive interview on June 1, 1983, referred to by counsel in oral argument, in which she recounted, in the presence of Dr. Wilhite and nurse Zaklan (and for a time Paula Krogdahl, a retired childcare worker), that she remembered going for a ride with her mother, sister, and brother and no one else in the car on the day she was hurt, and that there were no males present on the night of the shooting. In short, while Christie's youth, suggestibility, and medical condition (she was aphasic, or unable to communicate with speech, when she first awoke after the shooting) may have been a basis for challenging her credibility, there are no grounds for finding a due process violation. We therefore see no clear error in the rejection of this claim.

### B. Ineffective Assistance of Counsel

Downs further contends that trial counsel's failure to object to the competency of Christie's testimony constituted ineffective assistance. She argues that the district court, which held that the claim was procedurally barred, erred in failing to reach the merits because she has made a "credible showing of innocence." *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), holds that "if a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Id.* at 316, 115 S.Ct. 851. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial." *Id.* at 324, 115 S.Ct. 851. It is not enough that the evidence shows the existence of a reasonable doubt; the petitioner must show "that it is more likely than not that 'no reasonable juror' would have convicted him." *Id.* at 329, 115 S.Ct. 851. To overcome the procedural bar, Downs's *Strickland* and *Brady* claims must be so substantial as to bring the case "within the 'narrow class of cases ... implicating a fundamental miscarriage of justice.'" *Id.* at 315, 115 S.Ct. 851 (quoting *McCleskey v. Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)). Downs's *Strickland* claim does not rise to the level of nonharmless constitutional error. Downs, as noted above, has not demonstrated that Christie's testimony should have been excluded as tainted, but even had it been excluded, Downs's innocence claim is undermined by the compelling ballistic evidence. *Cf. Carriger v. Stewart,* 132 F.3d 463 (9th Cir.1997) (en banc) (petition qualified for gateway on a showing principally that the chief prosecution witness had confessed to the crime under oath in the postconviction court and that prosecution had failed to produce file disclosing that witness was a known liar). As discussed above, Downs's *Brady* claim is not persuasive and so cannot support her gateway claim either. Likewise, the affidavits Downs submitted to the district court, which contain conflicting versions of another person's "confession," do not support the showing that no reasonable jury could convict. Accordingly, we conclude that Downs's gateway claim is without merit.

Downs also argues that the district court erred by failing to hold a limited

evidentiary hearing for the purpose of hearing Christie's testimony. AEDPA bars an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). Downs argues that she was barred from deposing Christie before trial and then from calling her as a postconviction witness. However, even if Downs surmounts this bar, AEDPA bars a hearing

unless the applicant shows that—

(A) the claim relies on

. . .

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)(ii)-(B).

■ As discussed above, the claim based on Christie's testimony fails to meet that test. The facts underlying the claim are insufficient to establish by clear and convincing evidence that, but for the alleged constitutional error, no reasonable fact finder would have found her guilty. Moreover, even assuming Downs's claim could clear the hurdle posed by § 2254(e)(2), the fact that a hearing would be permitted does not mean that it is required. The district court retains discretion whether to hold one. *McDonald v. Johnson*, 139 F.3d 1056, 1059–60 (5th Cir. 1998). Here, the district court permitted Downs a year of discovery to develop the record in support of her petition. Its decision to deny an evidentiary hearing was not an abuse of discretion. *See Cardwell v. Greene*, 152 F.3d 331, 338–39 (4th Cir. 1998) ("We have long held that the need for an evidentiary hearing may be obviated by . . . expansion of the record").

## VI. FAILURE TO CALL DR. VERGAMINI

■ Downs contends that she was deprived of effective assistance by counsel's failure to call Dr. Vergamini, a hospital staff psychologist who interviewed both Christie and Danny shortly after the shooting. Christie told Vergamini that she did not remember the shooting and that she was genuinely confused about what happened. Downs contends that Vergamini's testimony would have supported the argument that Christie's testimony had been improperly influenced by the prosecution. Trial counsel stated that he did not call Vergamini because it would have involved "very little, if any, benefit and a great deal of risk" and would have duplicated other testimony. The postconviction court found counsel made a valid tactical decision. We find no clear error.

## VII. FAILURE TO USE STATE'S FINGERPRINT REPORT

■ Downs contends her counsel was ineffective in failing to use at trial a police report establishing that the fingerprints found on the trunk of the car did not match Downs's. Downs argues that this evidence would have supported her theory that someone else was at the crime scene and undermined the state's theory that she had retrieved the gun from the trunk. Trial counsel testified that he did not consider the evidence important to the defense and that he feared that jurors might suspect Downs had destroyed evidence by wiping away her own prints. The postconviction court found that trial counsel had adequately reviewed all available evidence and dealt with it properly at trial. We find no clear error.

## VIII. DOWNS'S REMAINING CLAIMS

Downs raises three additional claims: (1) that the trial court's refusal to grant a continuance in order to accommodate her choice of new counsel violated her Sixth Amendment rights and denied her effec-

tive assistance of counsel; (2) that the trial court's charge to the jury to enter verdicts on the agreed upon counts and continue deliberating on the remaining count was coercive; and (3) that appellate counsel's failure to raise these issues on appeal denied her effective assistance of counsel. Downs concedes that these claims were defaulted but relies on her claim of actual innocence to avoid the procedural default. For the reasons discussed above, we reject the contention.

## CONCLUSION

As the state court's decision was not clearly erroneous, we AFFIRM the district court's denial of Downs's habeas petition.

AFFIRMED.